UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| KENT ROBBINS, by and through Guardian ad Litem SARAH ROBBINS, individually and on behalf of all others similarly situated and the general public,<br><br>Plaintiff,<br><br>v.<br><br>MSCRIPTS, LLC, a Delaware Limited Liability Company,<br><br>Defendant. | Case No. 23-cv-01381-LB<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: ECF No. 26 |

**INTRODUCTION**

This is a putative class action against mscripts, Cardinal Health's mobile-pharmacy vendor. Its platform allows patients to request prescription refills electronically and receive text-message updates about them. The plaintiff — claiming violations of California law — sued on behalf of a nationwide class and California and nationwide subclasses after a misconfiguration of mscripts's cloud-storage environment resulted in the exposure of patient-health data from September 30, 2016, to November 18, 2022, when mscripts detected the issue.[1]

---

[1] Compl. – ECF No. 1. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

ORDER – No. 23-cv-01381-LB

Mscripts moved to compel arbitration on the ground that its terms of service, which patients agree to when they sign up, requires binding arbitration. Mscripts also contends that the terms require that the arbitrator decides questions of arbitrability.[2] The court grants the motion.

**STATEMENT**

The plaintiff uses the Safeway Pharmacy in the Albertsons store in Tehachapi, California. Mscripts is the pharmacy's vendor and thus had the plaintiff's protected health information, including his name, date of birth, address, insurance, and prescription medications.[3] On November 18, 2022, mscripts learned that its cloud storage was misconfigured and then determined that its system had not been protecting data securely since September 30, 2016. It notified the U.S. Department of Health and Human Services on January 17, 2023, began notifying patients on February 10, 2023, and notified the plaintiff on March 13, 2023.[4]

The complaint generally alleges a lack of appropriate security measures and a violation of patients' protected privacy interests.[5] There are four proposed classes: a nationwide class of persons in the United States with protected health information that was accessible on mscripts's unsecured cloud storage, a similar California subclass, a nationwide subclass of persons who paid money to pharmacies that subcontracted with mscripts, and a similar California subclass.[6] The plaintiff claims violations of California law: negligence, breach of contract, invasion of privacy, and violations of California's Unfair Competition Law and Consumer Legal Remedies Act.[7] He seeks declaratory relief under the federal Declaratory Judgment Act, injunctive relief, damages, fees, and costs.[8]

---

[2] Mot. – ECF No. 26.

[3] Compl. – ECF No. 1 at 5–6 (¶¶ 14–15).

[4] *Id.* at 2–3 (¶¶ 1–4), 6 (¶ 16).

[5] *Id.* at 9–22 (¶¶ 34–90).

[6] *Id.* at 22–25 (¶¶ 91–104).

[7] *Id.* at 28–59 (¶¶ 117–282).

[8] *Id.* at 59–60 (Prayer for Relief).

ORDER – No. 23-cv-01381-LB

The motion turns in part on whether the plaintiff consented to mscripts's terms of service.

On April 11, 2018, the plaintiff signed up at the Albertsons Safeway Pharmacy counter to receive text updates through the mscripts service. According to mscripts's Chief Technology Officer Steve Brickman, the plaintiff "would have been presented with mscripts'[s] Terms of Service at this time." The platform then autogenerated a text message to the plaintiff's phone number:

> Thank you KENT for signing up to Albertsons Rx alerts. Your account is active. 50msgs/mo. Msg&data rates may apply. Reply H for Help, STOP to cancel.[9]

The plaintiff never replied "STOP" to cancel text messaging.[10]

The mscripts terms of service had provisions about arbitration and the privacy policy at issue in the litigation. In an introductory paragraph, the terms state, in all capital letters:

> THIS AGREEMENT INCLUDES AN ARBITRATION CLAUSE, IN WHICH YOU AGREE THAT ANY DISPUTES WILL BE DECIDED BY AN ARBITRATOR WITHOUT A COURT OR JURY TRIAL.[11]

The introductory paragraph also says:

> The privacy policies that apply to your use of the Service are Your Pharmacy's Notice of Privacy Practices, available here . . . and the mscripts Privacy Policy. Both policies are hereby incorporated into this Agreement.[12]

In a section titled "**Arbitration**" (in bold), there is an arbitration clause:

> Any disputes between you on the one hand, and mscripts, Your Pharmacy, and/or mscripts Related Parties on the other, arising out of or relating to this Agreement, including the breach, termination, enforcement, interpretation, or validity thereof, or your use of the Service, shall be settled by binding arbitration conducted by the American Arbitration Association pursuant to its Commercial Arbitration Rules and Supplemental Procedures for Consumer Related Disputes, except that any party retains the right to bring a claim in small claims court and retains the right to seek injunctive

---

[9] Brinkman Decl. – ECF No. 26-2 at 2–3 (¶ 6). "A court may consider evidence outside the pleadings when ruling on a . . . motion to compel arbitration." *Thompson v. Isagenix Int'l LLC*, 849 F. App'x 712, 712 (9th Cir. 2021); *Hansen v. LMB Mortg. Servs.*, 1 F.4th 667, 670 & n.1 (9th Cir. 2021) (collecting cases for the proposition that "[t]he summary judgment standard is appropriate" under 9 U.S.C. § 4).

[10] Brinkman Decl. – ECF No. 26-2 at 3 (¶ 7).

[11] Terms of Serv., Ex. 1 to Brickman Decl. – ECF No. 26-2 at 8.

[12] *Id.*

ORDER – No. 23-cv-01381-LB

relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, or other intellectual property rights. The arbitration shall be conducted by a single arbitrator in San Francisco, California, unless the arbitrator shall determine that such venue is unduly burdensome and that a different venue is more appropriate. The interpretation of this clause and the arbitration proceeding shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. The arbitrator shall not have the power or authority to certify a class or preside over a class, mass, representative, or consolidated proceeding without our written consent. You acknowledge and agree that you hereby waive any right to a jury trial or to participate in a class action. This clause shall inure to the benefit of, and may be invoked by, any of mscripts'[s] subsidiaries, affiliates, agents, licensees, employees, contractors, participating pharmacies, or indemnitees. This arbitration clause shall survive any termination of this Agreement.[13]

On October 15, 2019, the plaintiff also registered for the Albertsons Safeway mobile app, which mscripts managed. As part of the registration process, he created an account by completing an electronic form within the app that required him to input his name, date of birth, mobile phone number, prescription number, the pharmacy name and location, an email address, and a password. He then had to click a "create account" button at the bottom of the page. Directly above the "create account" were these words: "By signing up for this service, I agree to the Terms and Conditions and Privacy Policies." "Terms and Conditions" and "Privacy Policies" appeared in bright blue font and were hyperlinked to allow access to the conditions and policies. The terms of service had the same arbitration provisions set forth above. The terms also had — like the earlier terms — a class waiver, a limitation of liability, a Delaware choice-of-law provision, and a provision that the privacy policy was incorporated into the terms of service.[14] The plaintiff completed the registration process by clicking the "create account" button.[15] He then received two autogenerated messages, the first a text to his phone and the second an email:

> Albertsons Rx: You've linked an app account to your text account. If you did not take this action or have any questions, please contact us at (866) 475-8547.
>
> Hi KENT, Thanks for registering with Albertsons. One last step, please confirm your email address here

---

[13] *Id.* at 15.

[14] Brinkman Decl. – ECF No. 26-2 at 3–4 (¶¶ 9–10).

[15] *Id.* at 4 (¶ 11).

ORDER – No. 23-cv-01381-LB

4

> https://albertsons.medrefill.com/abmweb/verifyemail.htm?token=994a7217d91d5dad5095c8060af06d5f41995e83 to get started. Thanks, Albertsons Pharmacy Team LEGAL DISCLAIMER: Not KENT? Please delete this email and notify us at albertsonssupport@mscripts.com or (866) 475-8547. This email contains confidential and private information and may expose you to legal liability.

The plaintiff clicked the link to confirm his email address.[16]

In November 2022, the plaintiff updated his phone number in the mobile app and received an autogenerated text message:

> Albertsons Rx: Hi KENT. Reply with a Y to accept Terms and enroll in Rx & health msgs. Terms @ http://albertsons.mxterms.com/tos Msg&data rates may apply.

The link to the terms of service was not hyperlinked. The terms had the same arbitration and other provisions. The plaintiff texted back "Y" that same day and received another autogenerated text thanking him for signing up and saying that his account was active.[17]

It is undisputed that the court has subject-matter jurisdiction under the Class Action Fairness Act. 28 U.S.C § 1332(d). The parties consented to magistrate-judge jurisdiction.[18] *Id.* § 636(c).

## ANALYSIS

Under the Federal Arbitration Act (FAA), "arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). The parties dispute three issues: (1) whether the plaintiff consented to the terms of service (and created a contract), (2) whether arbitrability was delegated to the arbitrator, and (3) whether the plaintiff's claims are about the privacy policy and thus outside the scope of the arbitration

---

[16] *Id.* (¶¶ 12–14).

[17] *Id.* at 5 (¶ 17).

[18] Consents – ECF Nos. 14, 15.

ORDER – No. 23-cv-01381-LB

5

clause.[19] The court holds that (1) the plaintiff assented to the terms of service, (2) the issue of arbitrability is delegated to the arbitrator, and (3) the claims are covered by the arbitration clause.

**1. Acceptance of Terms of Service**

The first issue is whether the plaintiff accepted the terms of service, creating a contract.

The most straightforward way for a user to accept terms of service is an agreement known as a clickwrap agreement:

> [A] website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed. Courts routinely find clickwrap agreements enforceable. At the other end of the spectrum are so-called 'browsewrap' agreements, in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website. Courts are generally reluctant to enforce such agreements because they often leave users unaware that contractual terms were offered, much less that continued use of the website will be deemed to manifest acceptance of those terms. When an online agreement falls between these two extremes, courts analyze mutual assent under an objective-reasonableness standard.

*Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513 (9th Cir. 2023) (cleaned up).

Here, there are three possible points of assent: April 11, 2018, October 15, 2019, and November 2022. The first is too nebulous: there are no screenshots, and the defendant does not describe how the terms would have been presented in 2018. The only utility to the declaration is that it shows that the plaintiff encountered the terms of service at the pharmacy counter in 2018.

October 2019 is better: the plaintiff inputted data and clicked a button to create the account directly below a statement that he agreed to the terms (and featuring a bright blue hyperlink to the terms). This is in between clickwrap and browsewrap: the user is not checking the clickwrap box, but the information is not hidden. The court thus analyzes the terms under the Ninth Circuit's two-part objective-reasonableness test.

---

[19] Opp'n – ECF No. 30 at 9–24. The defendant applies California contract law to the dispute because the state laws do not differ, and it wanted to deflect the plaintiff's argument that California law applied. Mot. – ECF No. 26 at 14–15; Opp'n – ECF No. 30 at 9.

"[A]n enforceable agreement may be found where the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* at 515 (cleaned up). "To satisfy the first part of the test, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it. This court looks to the conspicuousness and placement of the 'Terms of Use' hyperlink, other notices given to users of the terms of use, and the website's general design in determining whether a reasonably prudent user would have inquiry notice of a browserwrap agreement." *Id.* (cleaned up). "The second part of the test — whether the user takes some action that unambiguously manifests asset — is relatively straightforward. A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* (cleaned up).

In similar situations, courts have found assent to an online arbitration agreement. In *Cordas v. Uber Techs., Inc.*, for example, the plaintiff "affirmatively assent[ed] to Uber's terms and conditions [on the Uber app] by clicking 'DONE' to complete the sign-up process on a page clearly displaying the notice: 'By creating an Uber account, you agree to the Terms & Conditions and Privacy Policy.'" 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017).

In *Oberstein*, at three stages — creating an account, signing into an account, and completing a purchase — Ticketmaster and Live Nation users faced a confirmation button with text above it informing them that by clicking on the button, they agreed to the terms of use. Like the hyperlink here, the hyperlink to the terms was a bright blue font, "distinguishing it from the surrounding text." This was enough for part one of the objective-reasonableness test: "a reasonable user would have seen the notice and been able to locate the Terms via hyperlink." *Oberstein*, 60 F.4th at 515–16. "The notices were not buried at the bottom of the webpage or placed outside the action box, but rather were located directly on top of or below each action button. . . . [T]he context of this transaction, requiring a full registration process, reflected the contemplation of some sort of

continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 517 (cleaned up). The second part of the test was straightforward: the notices "explicitly alert the user that by creating an account, signing in, or purchasing a ticket, the user 'agrees to our Terms of Use.' . . . [T]hat is all that is required." *Id.*; *accord Bold Ltd. v. Rocket Resume, Inc.*, 22-cv-01045-BLF, 2023 WL 4157626, at *3–4 (N.D. Cal. June 22, 2023) (reasonably conspicuous notice under step one and unambiguous assent under step two when the notice under the "create my resume" button informed the user that by clicking on the button, he agreed to the "Terms of Use" and "Privacy Policy," both hyperlinked in bright blue); *Karim v. Best Buy Co.*, No. 22-cv-04909-JST, 2023 WL 3801909, at *3 (N.D. Cal. June 2, 2023) (reasonably conspicuous notice under step one and unambiguous assent under step two by notice text immediately above the "place your order" button that was plainly readable and had hyperlinks in bright blue) (collecting cases).

The plaintiff counters that typically, defendants submit a screenshot showing the sign-in process so that the court can evaluate factors such as the size of the text, the color of the text as compared to the background, the location of the text, the obviousness of the hyperlink, and whether other elements on the screen clutter or otherwise obscure the textual notice.[20] *See Oberstein*, 60 F.4th at 513–15 (analyzing these factors); *Karim*, 2023 WL 3801909, at *4 (same and collecting cases); *Williams v. DDR Media, LLC*, No. 22-cv-3789-SI, 2023 WL 2314868, at *3–7 (N.D. Cal. Feb. 28, 2023) (same). As discussed at the hearing, the platform — due to acquisitions — does not exist anymore, and thus it is not possible to generate screenshots. Conceptually, it is possible to look at a similar platform, generate screenshots, and have the Chief Technology Officer contend that it looks virtually similar. But that is in effect what he did: he explained the process, he is the person who designed the account signup, the account modifications, and how the terms of service are displayed, and his testimony is not disputed. Other courts find similar disclosures (albeit with screenshots) sufficient (as this order recounts). And in *Cordas*, the court relied on a similar declaration by Uber's

---

[20] Opp'n – ECF No. 30 at 13 (citing cases addressing these factors).

ORDER – No. 23-cv-01381-LB

Engineer Manager establishing what the plaintiff would have seen when he signed up to use Uber (although he included a screenshot that showed what a user would have seen). 228 F. Supp. 3d at 988–89. The plaintiff there — like the plaintiff here — did not raise any disputes of any material fact by his conclusory allegations attacking Uber's evidence, because he did not offer testimony or evidence about what he did see or rebut the declaration. *Id.* at 990.

Following *Cordas*, without any contradicting evidence about what the plaintiff saw, the court is not precluded from concluding as a matter of law that the plaintiff was on notice of mscripts's terms and conditions when he created his account. A contrary holding would mean that an obsolete platform is not subject to an arbitration clause merely because illustrative screenshots cannot be generated from a non-existent platform. If the declaration is sufficiently detailed, as it is here, then it paints a sufficient picture.

The plaintiff's citation to *Snow v. Evenbrite, Inc.*, No. 3:20-cv-03698-WHO, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020), does not change this analysis.[21] There, Eventbrite presented different versions of the sign-in agreements, said they depicted "versions of the agreements" (as opposed to here, where the declaration described what the plaintiff confronted), and did not say (unlike the defendant here) that it could not provide the actual pages. *Id.*

That said, as discussed at the hearing, if the defendant wants to supplement its submission to show screenshots that show what the plaintiff saw, it can on the briefing schedule set forth in the conclusion.

In sum, by setting up his account, the plaintiff agreed that disputes would be arbitrated.

The next issue is whether the same analysis applies to November 4, 2022. The plaintiff updated his mobile number in his account, received a confirmation number with the website link to the terms of service (albeit not hyperlinked), was told to text Y to consent to the terms of service, and texted Y.[22] The only difference from the October 2019 scenario is that there was not a hyperlink. Arguably, this presentation is much simpler: it is short, it is clear, access to the terms of service is

---

[21] *Id.* at 14.

[22] *See supra* Statement.

ORDER – No. 23-cv-01381-LB

9

presented, and there can be no confusion about the import of texting Y to accept those terms. On this record, the court concludes — informed by the context of the October 2019 acceptance of the terms of service — that the plaintiff accepted the terms of service on November 4, 2022.

### 2. Arbitrability

Under the FAA, "parties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy," "so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Henry Schein*, 139 S. Ct. at 529–30 (cleaned up); *Nelson v. Dual Diagnosis Treatment Ctr., Inc.*, 77 Cal. App. 5th 643, 654 (2022) ("[I]t is presumed the judge will decide arbitrability, unless there is clear and unmistakable evidence the parties intended the arbitrator to decide arbitrability."). "[B]efore referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein*, 139 S. Ct. at 530 (citing 9 U.S.C. § 2). "But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Id.*

The arbitration agreement contained the following delegation language:

> Any disputes between you on the one hand, and mscripts, Your Pharmacy, and/or mscripts Related Parties on the other, arising out of or relating to this Agreement, including the breach, termination, enforcement, interpretation, or validity thereof, or your use of the Service, shall be settled by binding arbitration conducted by the American Arbitration Association pursuant to its Commercial Arbitration Rules and Supplemental Procedures for Consumer Related Disputes, except that any party retains the right to bring a claim in small claims court and retains the right to seek injunctive relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, or other intellectual property rights.[23]

The clause thus provides that arbitration is the mechanism to resolve all disputes, including the interpretation and enforceability of the agreement. The plaintiff contends that this language is not a clear delegation and contrasts *Chung v. Nemer*, where the clause said that "[t]he Arbitrator, not

---

[23] *See supra* Statement.

ORDER – No. 23-cv-01381-LB

any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement."[24] No. C 12-4608 PJH, 2012 WL 5289414, at *1 (N.D. Cal. Oct. 25, 2012). But in *Stewart v. Acer Inc.*, the court held that similar "any dispute" language delegated all disputes to the arbitrator. No. 22-cv-04684-VC, 2023 WL 350385, at *1–2 (N.D. Cal. Jan. 20, 2023). The extra language in *Chung* does not change the basic thrust of the language (as the *Stewart* court held): arbitration is the mechanism to resolve all disputes, including those about interpretation of the agreement.

The plaintiff also argues that the agreement's severability provision — that if a court finds part of the agreement unenforceable, then the agreement will remain in full force and "will be reformed to be valid and enforceable while reflecting the intent of the parties to the greatest extent permitted by law" — is inconsistent with the delegation provision.[25] The *Stewart* court rejected as a "nonstarter" an argument that a severability provision — if a court held a provision of the agreement contrary to law, then the remaining provisions would remain in effect — meant that the agreement did not clearly delegate questions to the arbitrator because the severability provision conflicted with the delegation provision. "[T]he fact that the License agreement anticipated that a court might someday invalidate part of the agreement does not make the express delegation discussed above any less clear." *Id.* at *2 (applying *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1207–09 (9th Cir. 2016) and collecting and analyzing other cases).

Also, as the defendant asserts, courts have held that an "agreement's incorporation of the American Arbitration Association rules" — which provide that the arbitrator has the power to rule on its own jurisdiction — is "a clear delegation of authority to the arbitrator."[26] *Yu v. Volt Info. Scis., Inc.*, No. 19-cv-01981-LB, 2019 WL 3503111, at * 1, 4 (N.D. Cal. Aug. 1, 2019) (citing *Ortiz v. Volt Mgmt. Corp.*, No. 16-cv-07096-YGR, 2017 WL 1957072, at *2 (N.D. Cal. May 11,

---

[24] Opp'n – ECF No. 30 at 18.

[25] *Id.* at 19.

[26] Mot. – ECF No. 26 at 18. The court grants the defendant's unopposed request to judicially notice the AAA rules. Req. – ECF No. 26-3; Fed. R. Evid. 201(b); *Kag W., LLC v. Malone*, No. 15-cv-03827-TEH, 2015 WL 6693690, at *5 (N.D. Cal. Nov. 3, 2015) (judicially noticing arbitration rules).

2017), and *Brennan v. Opus Bank*, 796 F.3d 1125, 1129 (9th Cir. 2015)); *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD, 2017 WL 4551484, at *3–4 (N.D. Cal. Oct. 11, 2017) (also rejecting argument about the alleged conflict between the severability and delegation provisions).

In sum, the parties delegated questions of arbitrability to the arbitrator.

### 3. Retroactivity of Arbitration Agreement

The plaintiff contends that even if he consented to the terms of service, the privacy breach — and the vulnerability of his data on mscripts's cloud storage — predates his acceptance of the terms. The cloud storage was unsecured beginning on September 30, 2016, and the defendant admits that details of his prescription "were subject to the unsecured network on September 13, 2022," before he allegedly accepted the terms of service on November 4, 2022.[27]

First, the plaintiff consented to the terms of service in October 2019, before he provided mscripts with the prescription information allegedly put at risk in September 2022. That eliminates any concern that the arbitration provision applies to claims that accrued before the plaintiff agreed to the arbitration clause.

Second, assuming that there nonetheless is an issue, the plaintiff raised the argument in his opposition but did not cite cases. The defendant replied, citing two cases holding that arbitration clauses without a temporal limitation may be applied to claims that accrued before the plaintiff agreed to the clauses: *Azeveda v. Comcast Cable Commc'ns LLC*, No. 5:19-cv-01225-EJD, 2019 WL 5102607, at *6 (N.D. Cal. Oct. 11, 2019), and *Trujillo v. Gomez*, No. 14cv2483 BTM (BGS), 2015 WL 1757870, at *8 (S.D. Cal. Apr. 17, 2015).[28] At oral argument, the plaintiff cited two cases that did not apply an arbitration clause retroactively: *Castro v. ABM Indus.*, No. 17-cv-03026-YGR, 2018 WL 2197527 (N.D. Cal. May 14, 2018), and *Morse v. ServiceMaster Glob. Holdings Inc.*, No. C 10-00628 SI, 2012 WL 4755035 (N.D. Cal. Oct. 4, 2012).

---

[27] Opp'n – ECF No. 30 at 17.
[28] Reply – ECF No. 32 at 13.

ORDER – No. 23-cv-01381-LB

Courts have applied arbitration clauses without a temporal limitation to claims that precede the plaintiff's acceptance of the terms of service. *See, e.g.*, *Azeveda*, 2019 WL 5102607, at *6 (arbitration provision applied to "claims related to or arising from any aspect of the employment relationship" because it did not have a temporal limitation and thus applied to disputes that accrued previously); *Trujillo*, 2015 WL 1757870, at *8 (arbitration clause in distribution agreement for lighting products applied to "any claim or controversy arising out of or relating to this Agreement" did not contain a temporal limitation and thus applied to disputes that predated the agreements containing the arbitration clause).

On the other hand, courts have reached a different result when they conclude that the clauses govern future conduct, not past conduct. *Castro*, 2018 WL 2197527, at *4 (where the operative language of collective bargaining agreements required binding mediation to resolve "all Covered Claims, whenever they arise," courts hold that language like this governs present or future conduct, not past conduct) (collecting cases); *see also Morse*, 2012 WL 4755035, at *1, *4 (employment agreement required parties to use ServiceMaster's alternative-dispute resolution program "to resolve any and all work-related disputes/concerns and to mediate/arbitrate such disputes if they are not resolved;" the plaintiff had already filed his lawsuit before he signed the agreement; the dispute thus could not be subject to the alternative-dispute-resolution program).

The parties cite only cases involving arbitration clauses in employment or business contracts, not cases involving the acceptance of terms of service. The court assumes they do not exist. In any event, it matters whether the terms "arise" or "arising" involve the substance of the claims, not their timing. *Castro*, 2018 WL 2197527, at *4. The clause here covers "any disputes," without a temporal limitation, suggesting that the arbitration clause applies to claims that accrued before the plaintiff accepted the terms of service. (This of course does not address any concern that the context for arbitration clauses in terms-of-service contracts is different than employment or business contracts.) But because the plaintiff said that the access to his prescription information occurred on September 13, 2022, after he accepted the terms of service in 2019, the court

understands that it does not need to reach the issue. But if that is wrong, then the court allows supplemental briefing, as set forth in the conclusion.

**4. Scope of the Arbitration Agreement: Privacy Policy**

Finally, the plaintiff contends that his claims are outside the scope of the arbitration clause: he alleges that mscripts did not comply with its separate privacy policy, the policy is not part of the arbitration clause, and thus that clause does not apply.[29] But the terms of service expressly incorporated the privacy policies and required that disputes are to be arbitrated.[30] Also, the terms address mscripts's responsibility for data breaches: "any illegal interception or manipulation of data by a third party will not be the responsibility of mscripts or Your Pharmacy."[31]

## CONCLUSION

On this record, the court grants the defendant's motion to compel arbitration and stays the case pending arbitration. That said, if the defendant wants to supplement the record with a screenshot submission, it may do so within seven days and may include a supplement brief of up to three pages and a supplemental declaration. The plaintiff may file a three-page opposition fourteen days later, and the defendant may file a two-page reply seven days after that.

For the retroactivity analysis, if the plaintiff asserts a claim that precedes the acceptance of the terms of service on October 15, 2019, he may file a supplemental brief of up to three pages within seven days, the defendant may file a three-page opposition fourteen days later, and the plaintiff pay file a two-page reply seven days after that.

---

[29] Opp'n – ECF No. 30 at 20–23,

[30] *See supra* Statement.

[31] Terms of Serv., Ex. 1 to Brickman Decl. – ECF No. 26-2 at 13.

ORDER – No. 23-cv-01381-LB

This resolves ECF No. 26.

**IT IS SO ORDERED.**

Dated: September 5, 2023

_____
LAUREL BEELER
United States Magistrate Judge